UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

00 MAY -4  PM 3: 55

U.S. DISTRICT COURT
N.D. OF ALABAMA

GERALD DANIEL,                    )
                                  )
        Plaintiff,                )
                                  )
vs.                               )   Civil Action No. CV-98-S-3040-NE
                                  )
GOODYEAR DUNLOP TIRES NORTH       )
AMERICA, LTD.,                    )   **ENTERED**
                                  )
        Defendant.                )   MAY  4 2000

### MEMORANDUM OPINION

Plaintiff, Gerald Daniel, who is of African-American heritage, applied to work for defendant as a maintenance mechanic on three occasions, first in April of 1995, then February of 1996, and finally February of 1997.  Defendant rejected all applications. Plaintiff ultimately instituted this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, alleging that defendant discriminated against him on the basis of his race.  The case now is before the court on defendant's motion for partial summary judgment (doc. no. 20).[1] Upon consideration of the pleadings, briefs, and evidentiary submissions, the court finds that defendant's motion is due to be granted in part and denied in part.

---

[1] Defendant did not move to dismiss plaintiff's claims based on the February 1997 application.  Moreover, none of defendant's arguments relate to the merits of plaintiff's claims, *i.e.*, whether plaintiff has established a prima facie case of discrimination.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.)  The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial.  *See Celotex Corp. v. Catrett* , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case.  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.  When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *See Jeffery*, 64 F.3d

2

at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence <u>could</u> draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).   The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in the light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

In each of the three applications for employment plaintiff submitted to defendant's Huntsville, Alabama facility, he sought a maintenance mechanic position.  He had five years of experience in such work as an employee for Huntsville Manufacturing Company.[2] Plaintiff's most recent work experience, however, had been in the construction field.[3]

Plaintiff's first contact with defendant occurred during April of 1995, when he mailed a resume to defendant's personnel office.[4] Defendant scheduled plaintiff for an interview and, when he arrived

---

[2] Plaintiff's deposition at 22-25.

[3] *Id*. at 152.

[4] *Id*. at 111.

4

at the agreed time, he was asked to complete a formal application.[5]

He then talked with one of defendant's supervisors,[6] who informed

plaintiff that "if they was needing me, they would call me in to

take a maintenance test.   And I never did get called in."[7]

Plaintiff believed he was not called back because of his race.[8]

---

[5] *Id.*

[6] Plaintiff cannot recall the name of this supervisor. *Id.* at 110-11.

[7] *Id.* at 111.

[8] Plaintiff testified:

Q.   Did you think that you weren't called back for a test in the '95 process because of your race?

A.   Yes.

Q.   And why do you believe that?

A.   For one thing, I hear a lot of people — At that time, I heard a lot of people who I knew that worked out at Dunlop who said that for a black person to get into Maintenance is impossible to none.

Q.   Impossible to —

A.   — Zero.

Q.   Is that the only reason you thought that your not being called back for a maintenance test in 1995 was because of your race?

A.   Yes.  I felt that was enough to think that.

Q.   Who at Dunlop did you hear from that they felt it was impossible for a black to get into a maintenance job?

A.   Well, at that time, I can't remember, because it was so many people that I heard it from.

Q.   Were the individuals that you heard it from all black?

A.   Yes.

Q.   When you say it was a lot of people, how many was it?

In February of 1996, plaintiff "learned that [the] Alabama State Employment Service was taking resumes for Maintenance Mechanics positions at Dunlop."[9]  He applied a second time, and was again scheduled for interview.[10]  Plaintiff was interviewed separately by two maintenance supervisors who explained the type of work the position required, the benefits, and the pay scale.[11]  Plaintiff also spoke with Don Sharp, another maintenance supervisor, who administered a series of tests to plaintiff.[12]  "Mr. Sharp gave me a pneumatic test he had drawn out, ... [an] isometric test, math test, a test on how to read mics, like a little caliber deal, and also a welding test."[13]  Sharp "graded [each] test right then, and he said I passed all of them."[14]  Sharp also told plaintiff that "he had two maintenance positions open and had three candidates, and that he [didn't] see why I shouldn't get the job, and that he would be getting in touch with me sometime in the near future."[15]  When time passed without further word from defendant, however, plaintiff

---

        A.    Over five.

*Id.* at 111-113.

        [9] Plaintiff's affidavit ¶ 7.
        [10] Plaintiff's deposition at 103.
        [11] *Id.* at 104.
        [12] *Id.* at 104-05.
        [13] *Id.*
        [14] *Id.* at 106.
        [15] *Id.* at 108.

6

called the personnel department and spoke with Sean O'Halloran.[16]
O'Halloran informed plaintiff that the company had instituted a
hiring freeze, but "if the freeze was lifted, [he] would be the
next person they call[ed] in for the maintenance job."[17]  Plaintiff
believed that representation, and that the hiring freeze — not his
race — negatively influenced his job prospects.[18]

Plaintiff submitted his third application for employment on
February 18, 1997.[19]   In May of the previous year, however,
defendant's plant engineer, Ed Grooms, had implemented a new, four-
step hiring process.[20]   That process required all maintenance
department applicants to have "five years of industrial maintenance
experience," to pass "a written test of job-related maintenance
knowledge, skills, and abilities," to receive high ratings during
"verbal interviews with Maintenance Department managers,"[21] and to
receive a favorable performance evaluation after their first 60
days of employment.[22]

Despite plaintiff's performance on the tests administered the

---

[16] *Id.*; *see also* plaintiff's affidavit 10.

[17] Plaintiff's deposition at 109.

[18] *Id.* at 110, 143.

[19] Plaintiff's exhibit 10.

[20] Jacks' affidavit ¶ 2.

[21] Defendant maintains that it has not hired an applicant with an interview rating of "3" or lower since May of 1996.  Jacks' affidavit ¶ 4.

[22] *Id.*

previous year, he was given another written examination in accordance with the new procedures.[23]  Daniel Jacks, defendant's senior project engineer, administered the examination on February 18, 1997.[24]  Under defendant's new guidelines, the minimum passing score required was 75%.  Plaintiff achieved a grade of 82%.[25]

Plaintiff returned to the maintenance department on February 25, 1997, and was interviewed by two maintenance managers, both of whom were white.[26]  Plaintiff's first interview was with Cliff Blakely, and he gave plaintiff a favorable score of 4 on a scale of 1 to 5.[27]  Plaintiff thought the second interviewer, Paul Rodgers, appeared hostile.[28]  Rodgers asked plaintiff a technical question about the proper way to align a motor.[29]  When plaintiff asked Rodgers the type of motor the question was directed to, Rodgers took out a legal pad and "hand-sketched a motor, and said, 'How do you set that?'"[30]  Plaintiff responded to the question, but Rodgers believed plaintiff's answer to be incorrect.[31]  Due to the incorrect answer,

---

[23] Plaintiff's deposition at 77-78.

[24] Jacks' deposition at 12; plaintiff's deposition at 76.

[25] Plaintiff's deposition at exhibit 4.

[26] Plaintiff's deposition at 84-85, 171-72.

[27] Id. at 87; Jacks' Deposition at exhibit 2.

[28] Plaintiff's deposition at 168-69.

[29] Rodgers' deposition at 27.

[30] Plaintiff's deposition at 90.

[31] Rodgers' deposition at 27.

Rodgers rated plaintiff 3 on the same five point scale.[32]

Following his interviews, plaintiff met with O'Halloran in the personnel department.[33]  O'Halloran told plaintiff that "he didn't see why [plaintiff] shouldn't get the maintenance position, ... because [plaintiff] did good on the test, and he just didn't see why [plaintiff] shouldn't get the job."[34]  O'Halloran told plaintiff that the company "wasn't hiring, but they would be hiring in the next week or so."[35]  David Jacks, the decisionmaker with respect to defendant's hiring decisions, also was in favor of hiring plaintiff.[36]  When plaintiff did not hear from O'Halloran the following week, he called and was told "that [he] was qualified for the job but [he] wasn't what they [were] looking for."[37]

Following the third rejection, plaintiff concluded that his race was the true reason he had not been offered employment,[38] and he filed a charge of discrimination with the Equal Employment Opportunity Commission on April 12, 1997.[39]  Plaintiff later

---

[32] *Id.* at exhibit 7.

[33] Plaintiff's deposition at 100.

[34] *Id.*

[35] *Id.* at 126.

[36] Jacks testified that plaintiff was not hired because he was not the best qualified candidate.  Jacks was unable, however, to identify any other candidate tested in February of 1997.  Jacks' deposition at 81-82.

[37] Plaintiff's deposition at 101.

[38] *Id.* at 143-44.

[39] *Id.* at exhibit 6.

explained:

> I know that I'm qualified.  And it seems like everything is
> okay until I show up and when they see me.  That's when, you
> know, they throw these different types of tests together,
> and it seems like they're just going through the motions to
> satisfy me as far as taking all these different tests,
> because each different test that I took, I felt that they
> wasn't professional at all.  The quality of the tests, ...
> and all these, you know, handwritten tests that just come
> off the top of your head, ... wasn't professional at all.
> To me, it was just something to get me in and get me out of
> the way.
> ...
> [W]hat was the purpose of taking all these tests, when I
> passed all of them and I wasn't hired?  So I felt that I
> passed all of these test, you know, and I should have got
> the job, because if I wasn't qualified, I shouldn't have
> been given all these different type of tests.[40]

Plaintiff also learned from his brother, an employee of defendant

working in the production department, that several white males had

been hired to fill the vacant maintenance positions.[41]  Moreover,

no persons of African-American heritage have been hired in the

maintenance department since January of 1995, compared to eighteen

Caucasian applicants and one Hispanic applicant hired in the same

time period.[42]  Significantly, one of the white applicants, Billy

Miller, was hired despite receiving a failing score on the written

examination.[43]  Admittedly, only two African-Americans, including

---

[40] *Id.* at 131-32.

[41] *Id.* at 126-27.

[42] Jacks' deposition at 44; *see also* plaintiff's exhibit 3 (Rutledge's affidavit).

[43] Jacks' deposition at 52.

10

plaintiff, had recently applied for employment with defendant, but the fact remains that neither was hired.[44]

### III. DISCUSSION

**A. The Timeliness of Plaintiff's 1995 and 1996 Applications**

Defendant asserts that all claims relating to plaintiff's 1995 and 1996 applications for employment are due to be dismissed as time barred, because the statute of limitations for actions under 42 U.S.C. § 1981 in the State of Alabama is two years. Moreover, defendant asserts, the same claims also are untimely under Title VII, because plaintiff's EEOC charge was filed on April 12, 1997, more than 180 days from either application date. In response, plaintiff argues that the statute of limitations governing § 1981 claims is four years, not two. He also relies on a theory of "continuing violations" to toll the statutes of limitation. The court will address each argument in turn.

**1.   The Limitations Period for § 1981 Claims**

Plaintiff filed his complaint on December 8, 1998. His earliest applications for employment were submitted more than two years before that date, during April of 1995, and February of 1996.

It is well settled that § 1981 — like §§ 1982 and 1983 — does not contain a statute of limitations. As a result, the Supreme

---

[44] Plaintiff's exhibit 9 at 4-5.

Court instructs district courts to "select the most appropriate or analogous state statute of limitations." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660, 107 S.Ct. 2617, 2620, 96 L.Ed.2d 572 (1987). In Alabama, that limitations period is two years. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (citing Alabama Code § 6-2-38(l) for the proposition that § 1981 claims arising out of acts occurring in Alabama are governed by the State's general, two-year limitations period); *see also Goodman*, 482 U.S. at 661-664, 107 S.Ct. at 2620-2622 (holding that the court of appeals correctly applied Pennsylvania's two year statute of limitations for personal injury actions to § 1981 claims).

In the teeth of such binding authority, plaintiff argues that § 1981 claims are governed by the four-year statute of limitations found in 28 U.S.C. § 1658. That statute created a uniform federal statute of limitations for all civil actions created by Congress after December 1, 1990, the effective date of the act.

> Except as otherwise provided by law, a civil action arising <u>under an Act of Congress enacted after the date of the enactment of this section</u> may not be commenced later than 4 years after the cause of action accrues.

28 U.S.C. § 1658 (emphasis supplied). Plaintiff contends that § 1658, when juxtaposed to the amendments of § 1981 included in the

12

Civil Rights Act of 1991, supercedes the holdings in *Goodman* and *Peterson*.

Section 1981 was originally enacted as part of the Civil Rights Act of 1866. During subsequent years the law underwent a series of reenactments and recodifications, including the reenactment of the 1866 Act in § 18 of the Voting Rights Act of 1870. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436-37, 88 S.Ct. 2186, 2201-02, 20 L.Ed.2d 1189 (1968). Prior to the 1991 amendments, § 1981 contained only one paragraph providing that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The Supreme Court interpreted that language narrowly, holding that it "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Patterson v. McLean Credit Union*, 491 U.S. 164, 171, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989). Under that construction, § 1981 neither encompassed allegations of racial harassment in the workplace, nor of discrimination in the performance, modification, and termination of

13

contracts.  *Id.*

In response to the Supreme Court's decision in *Patterson*, Congress amended § 1981 on November 21, 1991, by relabelling, without modification, the existing language of § 1981 as § 1981(a). *See* Civil Rights Act of 1991, Pub.L. No. 102-166, Title I, § 101. The 1991 Act also added two new subsections.  *Id.*  Of pertinence here, the act defined the phrase "make and enforce contracts" in a new subsection "(b)," to make clear the words encompassed more than just contract formation.

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(b).  Plaintiff contends the 1991 additions to § 1981 bring the amended statute under the purview of § 1658.  This court disagrees, and instead concludes, as have other district courts in the Eleventh Circuit, that § 1658 does not apply to § 1981.  *See Lane v. Ogden Entertainment, Inc.*, 13 F. Supp. 2d 1261, 1268 (M.D. Ala. 1998); *Jackson v. Motel 6 Multipurposes, Inc.*, Nos. 96-72-CIV-FTM-17D, 96-115-CIV-FTM-17D, 1997 WL 724429 (M.D. Fla. Nov. 6, 1997); *Chawla v. Emory University*, No. 1:95CV0750JOF, 1997 WL 907570 (N.D. Ga. Feb. 13, 1997).

14

First, plaintiff's interpretation of § 1658 is contrary to the plain language of the statute.  Section 1658 applies only to "'an Act of Congress <u>enacted</u>' after 1990, which of course, is entirely different from 'an act of Congress <u>amended</u>' after 1990." *Jackson*, 1997 WL 724429, at *2 (emphasis supplied) (quoted with approval in *Lane*, 13 F. Supp. 2d at 1268).  Although the Civil Rights Act of 1991 added new causes of action to § 1981 by defining the phrase "make and enforce contracts," § 101 of the Act expressly described the changes thus wrought as <u>amendments</u>.[45]  As a result, this court, like the U.S. District Court for the Middle District of Alabama,

> believes that the best way to avoid ... difficulties is to hold that § 1658 applies only when there is <u>an entirely new statute created by Congress</u>.  If Congress had meant for § 1658 to apply to amendments, they could have said so.  Until Congress does say so, the settled expectations of the parties — that a two year statute of limitations applies — should not be disturbed.  It was settled by the Supreme Court in 1987 that § 1981 actions should borrow the statute of limitations for personal injury in the state. ... That is

---

[45] Section 101 provides:

Section 1977 of the Revised Statutes (42 U.S.C. § 1981) is <u>amended</u>—
(1)   by inserting "(a)" before "All persons within"; and
(2)   by adding at the end the following new subsections:
    "(b) For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."
    "(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (emphasis supplied).

> two years in Alabama; and has been routinely recognized as
> applicable in § 1981 cases.   At this point, the court
> considers the best policy to be *stare decisis*.   Even if it
> is wrong, it will at least not upset expectations, and will
> not cause a variance among the district courts of this
> state. ...

*Lane*, 13 F. Supp. 2d at 1270 (emphasis supplied) (citing *Goodman*,

482 U.S. 660-62, 107 S.Ct. at 2621-22); *See also Mason v. Anadarko*

*Petroleum Corporation*, No. 97-1051-WEB, 1998 WL 166562 (D. Kan.

March 2, 1998) (concluding that "[g]iven the clear indication in

the statute that § 1658 was intended to apply prospectively only,

... the court believes that the more persuasive view is that

Congress did not intend to alter the practice of borrowing state

statutes of limitation for actions arising under ... § 1981");

*Chawla*, 1997 WL 907570, at *14 (finding that "Congress did not

repeal old § 1981 and enact a new statute that was incidentally

codified at the same number, [and] a claim brought under subsection

(a) of amended § 1981 must be construed as a claim arising under

The Civil Rights Act of 1866, as amended by The Civil Rights Act of

1991").

Secondly, plaintiff's interpretation of § 1658 is contrary to

the legislative history of the Civil Rights Act of 1991.  As the

House Committee on Education and Labor observed:

> Current law provides for a generally longer statute of

16

limitations for claims of intentional employment discrimination based on race than for other forms of employment discrimination. Title VII provides that an employment discrimination claim must be filed within 180 days following the alleged unlawful employment practice (300 days if the charge is filed with a state or local agency). <u>But under 42 U.S.C. section 1981, which bars intentional race discrimination in employment as well as other contractual relations, victims have a longer period of time to commence suits. In the absence of an express limitations period in section 1981, courts applying the statute have looked to analogous state statutes of limitations. These statutes typically allow two or three years, and allow up to six years in some states.</u> Thus, under current law, women, religious minorities and members of other protected groups must file claims within 180 days while victims of intentional race discrimination may still commence suit under section 1981 long after the expiration of this period. This disparity serves no purpose.

H.R.Rep. No. 102-40(I), at 63 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 601 (emphasis supplied). This statement "indicates Congress' belief in 1991, after § 1658 was put into effect, that state statutes of limitations would continue to be borrowed for § 1981 claims following the 1991 amendments." *Williams v. Home Depot*, No. 98-CV-3712, 1999 WL 788597, at *4 (E.D.Pa. Oct. 5, 1999); *see also Lasley v. Hershey Foods Corp.*, 35 F. Supp. 2d 1319, 1322 (D. Kan. Jan. 27, 1999) (concluding that "the legislative history of the Civil Rights Act of 1991 manifests Congress' belief that the applicable state statutes of limitations for personal injury would continue to apply to § 1981 claims even

after the 1991 amendments").

Accordingly, the court rejects plaintiff's contention that § 1658 affords the proper statute of limitations for actions under § 1981.[46]

Therefore, unless plaintiff successfully argues that the statute of limitations is due to be equitably tolled, his § 1981 claims based upon the first two employment applications are time barred. In order for his Title VII claim to be timely, an even shorter limitations period applies. Plaintiff must have filed his charge of discrimination with the EEOC within 180 days of the "alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). Thus, unless plaintiff can prove the existence of a continuing violation, the claims related to the 1995 and 1996 employment applications are barred under both statutes.

## 2.   "Continuing Violations" and Equitable Tolling of the Limitations Period

Plaintiff argues that defendant's actions in rejecting all of

---

[46] In rejecting plaintiff's contention, the court also rejects all contrary authority. *See, e.g.*, Pitts v. Chester County Hospital, No. 99-2488, 2000 WL 19631 (E.D. Pa. Jan. 11, 2000) (finding that the statute of limitations was four years for plaintiff's claim of unequal pay); Miller v. Federal Express Corp., 56 F. Supp. 2d 955, 965 (W.D. Tenn. 1999) (finding that § 1658 is applicable to plaintiff's § 1981 claim, because, among other reasons, "the impetus behind Congress' enactment of § 1658 was to develop uniformity in the characterization of federal claims"); Rodgers v. Apple South, Inc., 35 F. Supp. 2d 974, 976 (W.D. Ky. 1999) (finding that § 1658 is applicable to all § 1981 claims); Stewart v. Coors Brewing Company, No. 97-B-1467, 1998 WL 880462 (D. Colo. Dec. 14, 1998) (applying a four-year statute of limitations to plaintiff's § 1981 claim).

his applications are the result of an ongoing policy of racial discrimination.   The continuing violation doctrine allows a plaintiff to revive, and make actionable, time-barred acts of discrimination by connecting them to discriminatory acts falling within the limitations period.   As the former Fifth Circuit explained in *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241 (5th Cir. 1980),[47]

> [a] past act of discrimination for which a party did not file a charge of discrimination with the EEOC within the limitations period is legally equivalent to a discriminatory act that occurred before the enactment of Title VII. Although such a past discriminatory act may continue to effect an employee's present pay and fringe benefits, such an effect does not constitute a continuing violation of Title VII. ...   "[T]he critical question is whether any present violation exists." ...
>
> ...
>
> Where an employee charges an employer with continuously maintaining an illegal employment practice, he may file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice. ... However, where the employer engaged in a discrete act of discrimination more than 180 days prior to the filing of a charge with the EEOC by the employee, allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the requirement of 42 U.S.C. s 2000e-5(e) that the plaintiff file his charge of discrimination within 180 days of the discriminatory act. ...

---

[47] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

*Gonzalez*, 610 F.2d at 249 (citations omitted).

Moreover, a court "must distinguish between the 'present consequence of a one-time violation,' which does not extend the limitations period, and the 'continuation of the violation into the present." *Beavers v. American Cast Iron Pipe Company*, 975 F.2d 792, 796 (11th Cir. 1992) (citation omitted). "Where the employer engaged in a discrete act of discrimination outside the limitations period, allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the statute of limitations." *Knight v. Columbus, Ga.*, 19 F.3d 579, 580 (11th Cir. 1994).

The problem with plaintiff's argument that defendant's refusal to hire him on all three occasions is the result of an ongoing policy of racial discrimination lies in this fact:  plaintiff was aware of his rights in 1995, but failed to exercise them. Plaintiff unequivocally testified that he believed his race to be the reason defendant refused to offer him a job.[48]  Plaintiff's knowledge of defendant's motivation, but failure to pursue the matter, precludes him from relying on a continuing violation theory

---

[48] *See* the excerpt from pages 111-113 of plaintiff's deposition, recorded in note 8 *supra*.

to revive claims based on that incident.

> To the extent that [defendant] injured him on a continuing
> basis as a result of the [1995] incident, it was only
> because he knowingly failed to exercise his rights. A claim
> arising out of an injury which is "continuing" only because
> a putative plaintiff knowingly fails to seek relief is
> exactly the sort of claim that Congress intended to bar by
> the 180-day limitation period.

*Roberts v. Gadsden Memorial Hospital*, 850 F.2d 1549, 1550 (11th

Cir. 1988). Accordingly, all claims related to the 1995

application are due to be dismissed. *See Bullington v. United Air*

*Lines, Inc.*, 186 F.3d 1301, 1311 (10th Cir. 1999) (dismissing one

of plaintiff's failure to hire claims because she "was, at the very

least, on inquiry notice of the alleged discrimination as early as

1993, [and] she had a duty to assert her rights at that time").

The same result does not necessarily pertain to plaintiff's 1996

employment application, however. In that instance, plaintiff

entertained a reasonable belief that he might be hired despite his

race. The day of his interview, Don Sharp, one of defendant's

maintenance supervisors, told plaintiff that "he had two

maintenance positions open and had three candidates, and that he

[didn't] see why I shouldn't get the job, and that he would be

getting in touch with me sometime in the near future."[49] When

plaintiff called to inquire about the status of his application,

---

[49] *Id.* at 108.

O'Halloran, one of defendant's employees in Human Resources, told him that the company had instituted a hiring freeze, but "if the freeze was lifted, [he] would be the next person they call in for the maintenance job."[50]  Plaintiff testified that he believed that there was, in fact, a hiring freeze in effect at that time.[51]

> Well, in 1996, after Sean said that there was a hiring freeze, I took his word that they wasn't hiring anybody in Maintenance; so there wasn't any sense in going any further with it.[52]

Based on this testimony, plaintiff's failure to challenge the second rejection was neither the result of mere inaction, nor a knowing failure to seek legal relief.  Rather, his decision was based on a reasonable perception that he would be considered for employment, once the hiring freeze was lifted.  Therefore, the court must examine whether the continuing violation doctrine applies to preserve this claim.

The substance of plaintiff's continuing violation argument centers around defendant's failure to hire any African-American employees in the maintenance department since January of 1995.

> In this case, the wholesale failure to hire African-Americans into the Maintenance Department constitutes a policy of exclusion based on race.  Between January 1995 and January 1999, Dunlop hired at least nineteen white persons

---

[50] Plaintiff's deposition at 109.

[51] *Id.* at 110, 143.

[52] *Id.* at 110.

> from outside the facility to join the Maintenance
> Department.   There were no African-American maintenance
> mechanics hired during this period. ...   The plaintiff had
> a valid and active application on file starting in 1995.
> The defendant's failure to consider Daniel for a Maintenance
> Mechanic position during 1995 and 1996 was continuing in
> nature.
>
>   The failure to hire a single African-American over a four
> year period during which there were nineteen hires,
> represents what the Supreme Court has labeled the
> "inexorable zero" which supports an inference that there is
> a policy toward not hiring African-Americans for maintenance
> positions. ...
>
>   ...
>
> <u>Further evidence of a policy towards only hiring white
> candidates is reflected in the hiring of white persons who
> do not meet the company's stated criteria</u>.   There is a
> written test which must be passed. ... The minimum passing
> score is 75%. ... Defendant's Answers to Interrogatories
> reflect that Lonnie Miller, white, was hired without meeting
> this score....

Plaintiff's brief (doc. no. 36) at 21-22 (emphasis supplied)

(citation omitted).

A continuing violation may be based on either a series of

related acts taken against a single individual, or the maintenance

of a company-wide policy or practice of discrimination. *See Dixon*

*v. Anderson*, 928 F.2d 212, 216 (6th Cir. 1990) (discussing two

categories of continuing violations); *Jensen v. Frank*, 912 F.2d

517, 522 (1st Cir. 1990) (distinguishing between a serial and

systemic violation).   The First Circuit has explained the two

theories as follows:

> [A serial] violation is composed of a number of
> discriminatory acts emanating from the same discriminatory
> animus, each act constituting a separate wrong actionable
> under Title VII. ... In other words, a serial violation is
> "continuing" by virtue of the fact that it keeps happening,
> ... an employee, say, is passed over several time for
> promotion, based on the same (actionable) animus. ...
>
> Moreover, a serial violation, to be actionable requires
> the complaining party to demonstrate "that some
> discriminatory act transpired within the [limitation
> period.]" The interdicted act must constitute
> discrimination as to the plaintiff. ...
>
> ...
>
> By contrast with a serial violation, a systemic violation
> need not involve an identifiable, discrete act of
> discrimination transpiring within the limitation period. ...
> A systemic violation has its roots in a discriminatory
> policy or practice; so long as the policy or practice itself
> continues into the limitation period, a challenger may be
> deemed to have filed a timely complaint. ...

*Jensen*, 912 F.2d at 522-23 (citations omitted) (emphasis in
original).

Here, plaintiff's argument is similar to the one recognized in
*Roberts v. North American Rockwell Corporation*, 650 F.2d 823 (6th
Cir. 1980). In *Roberts*, the female plaintiff continually made oral
inquires about her employment application while it was on file with
a company that had an alleged policy of hiring only male
applicants. *Id.* at 827. She never received a formal rejection,

but was repeatedly told that the company did not hire women.  *Id.* at 827-29.  The Sixth Circuit concluded that the plaintiff's claim was timely, because one of her oral inquiries fell within the relevant limitations period.  *Id.* at 828.

> If a company discriminates by firing an employee because of his/her race or sex, the discriminatory act takes place when the employee is fired.  The statute of limitations ordinarily starts running from this date. ...
>
> The issue becomes more difficult when a company fails to hire or promote someone because of their race or sex.  In many such situations, the refusal to hire or promote results from an ongoing discriminatory policy which seeks to keep blacks or women in low-level positions or out of the company altogether.  In such cases, courts do not hesitate to apply what has been termed the continuing violation doctrine. ...
>
> ...
>
> [B]y definition, if there is a continuing violation, the company is continually violating Title VII so long as its discriminatory policy remains in effect.  An applicant for employment or promotion will, in many circumstances, be interested in any suitable position which opens up.  As job openings become available, the applicant will automatically be rejected because of his/her race, sex, or national origin.  We see no reason to formalistically require an applicant to continuously apply, only to be continuously rejected.  We do not think that Title VII requires that suit be filed when the applicant is initially discriminated against.  If an ongoing discriminatory policy is in effect, the violation of Title VII is ongoing as well.

*Roberts*, 650 F.2d at 826-27 (citations omitted).

This court agrees with the holding in *Roberts,* and concludes that plaintiff's 1996 application should be afforded protection

under the continuing violation doctrine.  Although plaintiff was never explicitly told that he was not hired because of his race, plaintiff has established that defendant has not hired any African-American employees since January of 1995, and that there are a maximum of four persons of African-American heritage on its maintenance department payroll, which exceeds one hundred individuals.[53]  Moreover, plaintiff has proffered evidence that at least one Caucasian employee was hired despite a failing score on his written examination, thus creating a genuine issue of material fact as to whether defendant's employment policies are uniformly applied.  For such reasons, summary judgment is due to be denied.

## B. Plaintiff's Request for Compensatory and Punitive Damages

Defendant also moves to strike plaintiff's requests for compensatory and punitive damages.  Defendant argues that plaintiff has not established evidence of actual harm entitling him to recover compensatory damages.  The court disagrees.  "Although compensable damage must be proven, general compensatory damages, as opposed to special damages, need not be proven with a high degree of specificity.  Compensatory damages 'may be inferred from the circumstances as well as proved by the testimony.'"  *Ferrill v. Parker Group*, 168 F.3d 468, 476 (11th Cir. 1999).  Moreover, "[t]he

---

[53] Jacks' deposition at exhibit 9.

standard of review for awards of compensatory damages for intangible, emotional harms is 'deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses.'" *Id.* Here, the court finds that plaintiff has adduced sufficient evidence to submit his claim for compensatory damages to the jury. Specifically, the court notes that plaintiff sought employment with defendant because the salary, benefits, and location was preferable to his work in the construction industry.

> Our [construction] work is forty-eight miles away from home. Whenever it rains, I can't work, because I'm outside. That's it. ... If I get sick or ain't able to work, I don't get paid for that; I lose that.[54]

Moreover, plaintiff's wife testified that:

> Since 1996 when Gerald believed that he was going to be hired I have noticed a marked change in his moods and emotional state. He appears to be depressed and non-talkative. In 1997-98, he was employed at a construction site far from our home, and now actually has obtained employment in Tennessee.[55]

Mrs. Daniels also has testified that their "marriage has experienced difficulty" due to financial strains, and plaintiff's long daily commute to work.[56] Based on this evidence, plaintiff has created an issue of fact, entitled to submission to a jury.

---

[54] Plaintiff's deposition at 152.

[55] Sandra Daniels' affidavit ¶ 4.

[56] *Id.* ¶¶ 7,8.

27

Regarding plaintiff's claim for punitive damages, Congress amended Title VII in 1991 to provide for punitive damages if a private employer engages in intentional, unlawful discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Supreme Court clarified the standard for awards of punitive damages in *Kolstad v. American Dental Association*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Section 1981a "provides for punitive awards based solely on an employer's state of mind.... The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at ---, 119 S.Ct. at 2124. The Supreme Court rejected those interpretations which required "egregious" conduct by an employer before punitive damages could be available. *Kolstad*, 527 U.S. at ---, 119 S.Ct. at 2124. Instead, the Court held that an employer may be liable for punitive damages in any case where it "discriminate[s] in the face of a perceived risk that its actions will violate federal law." *Id*. at ---, 119 S.Ct. at 2125. The court made clear that, although egregious conduct could be evidence of evil intent, such conduct was not

28

required to establish punitive damages liability.  *Id.* at ——-, 119
S.Ct. at 2126.  The Court explained that under this standard:

> There will be circumstances where intentional
> discrimination does not give rise to punitive damages....
> In some instances, the employer may simply be unaware of the
> relevant federal prohibition.  There will be cases,
> moreover, in which the employer discriminates with the
> distinct belief that its discrimination is lawful.  The
> underlying theory of discrimination may be novel or
> otherwise poorly recognized, or an employer may reasonably
> believe that its discrimination satisfies a bona fide
> occupational qualification defense or other statutory
> exception to liability. ...

*Id.* at ---, 119 S.Ct. at 2125 (citation omitted).  Plaintiff must
also impute liability to the employer, by showing that an agent
employed in a "managerial capacity" acted in the scope of his
employment.  *Id.* at ——-, 119 S.Ct. at 2126.

Here, plaintiff relies on the testimony of David Jacks to
impute liability.  Specifically, plaintiff argues that Jacks'
testimony establishes a reckless indifference to the prohibitions
of Title VII and § 1981.  Jacks, defendant's senior project
engineer and the decisionmaker with respect to defendant's hiring
decisions, admits that he was in favor of hiring plaintiff:

Q.     And it's your belief that you were in favor of hiring
       [plaintiff]?

A.     I recall that, yes.

Q.     Then can you tell me why ... he wasn't hired?

A.      In the course of the process, which is always a
        process, Mr. Daniel was evaluated and compared with
        other candidates.  And in my opinion, Mr. Daniel at
        that time was not the best qualified candidate with
        ... all the evidence being presented....

Q.      Who were the other candidates?

A.      I don't recall.

Q.      Well, Mr. Daniel's records indicate that he was
        tested in February of 1997 and there were no other
        candidates tested at that time according to my
        records.  Do you recall anyone else being tested at
        that time?

A.      No.

Q.      I'm just curious who you're comparing his
        qualifications against if you can recall?

A.      I don't recall specifically.[57]

Resolving all inferences in favor of plaintiff, the court finds
that summary judgment is due to be denied.

## IV.   CONCLUSION

Based on the foregoing, the court finds that defendant's motion
for summary judgment is due to be granted in part and denied in
part.  An order consistent with this memorandum opinion will be
entered contemporaneously herewith.

DONE this __4th__ day of May, 2000.

_____
United States District Judge

---

[57] Jacks' deposition at 81-82.